**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| NUTREANCE LLC, *et al.*, | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18-cv-00098-SRC |
| | ) | |
| PRIMARK, LLC, *et al.,* | ) | |
| | ) | |
|    Defendants. | ) | |

**<u>Memorandum and Order</u>**

     This is a trademark infringement/false advertising case involving competitors in the nutritional-supplements market.  Plaintiffs allege that Defendants orchestrate a scheme to publish sham reviews of Plaintiffs' products online, on websites purporting to be independent and unbiased, but actually controlled by Defendants.  These review sites include "rankings" of products that invariably rank Plaintiffs' products as inferior, and rank Defendants' competing products as the top choice.  Plaintiffs further allege that Defendants use Plaintiffs' trademarks as paid search engine terms to steer potential customers to the fake review sites, and ultimately to Defendants' own products.

     This matter comes before the Court on several pending motions.  Defendants move for summary judgment on all claims in Plaintiffs' complaint.  Doc. 140.  Defendants also move to strike certain exhibits submitted by Plaintiffs in opposition to Defendants' motion for summary judgment.  Doc. 170.  Defendants separately move to exclude the testimony of Plaintiffs' damages expert, Sanford Krachmalnick.  Doc. 146.   Finally, Plaintiffs move to strike portions of a declaration of Defendants' lead counsel, and related supporting materials.  Doc. 157.

I.     **Facts and background**

A.     **The parties**

Plaintiff Nutreance LLC markets and sells nutritional supplement products under trade names including RediCalm, RediMove, RediMind, and RediNite.  Plaintiff Idingo, LLC markets and sells nutritional supplement products under trade names including Proaxil, Menoprin, Jointprin, and Brainol.  Plaintiff Koech Corp. markets and sells nutritional supplement products under trade names including Macafem.  Koech Corp. federally registered the MACAFEM trademark in 2013.  In 2018, after the filing of this lawsuit, Nutreance LLC federally registered the trademarks REDICALM, REDIMOVE, REDIMIND, and REDINITE.  All Plaintiffs market and sell their nutritional products on the internet.

Defendant Admark, LLC also markets and sells nutritional supplements on the internet.  Defendants Danny and Brendan O'Shea are the sole members of Admark, LLC.  Defendants Primark, LLC, iHealth Fulfillments Services Limited Liability Company, and Wastena Holdings, LLC are additional entities, either active or dissolved, of which Danny and Brendan O'Shea are or were the sole members.  Defendant Olympia O'Shea is Danny O'Shea's wife.

B.     **The non-party review hosts**

21 Century Web is an India-based entity that publishes online reviews of nutritional supplements.  21 Century Web hosts these reviews at websites including consumerhealthdigest.com, dailyhealthanswers.com, and thebeautyinsiders.com (the "Review Websites").  The founder and CEO of 21 Century Web is Mohammed Khanbahadur.  In 2019, Khanbahadur formed a new entity, Kyzooma Pvt. Ltd., using the same business address as 21 Century Web, and transferred ownership of the Review Websites to Kyzooma.  Doc. 105-6.  The Court refers to non-parties 21 Century Web and Kyzooma collectively as the Review Hosts.

In 2015, Admark contracted with the Review Hosts to conduct "affiliate marketing" for Admark.  Under the affiliate marketing agreement, Admark agreed to pay the Review Hosts a 20% commission on all sales of Admark products referred by the Review Websites.  The Review Hosts agreed to place banner advertisements for Admark products on the Review Websites.  In turn, Admark agreed to allow the Review Hosts to use its intellectual property (including trade names) in product reviews published on the Review Websites.

The Review Hosts disclose on the Review Websites that they may receive a commission for sales of products referred by the Review Websites.  However, an "Advertising Disclosure" on all Review Websites states: "We are independently owned and the opinions expressed herein are our own.  All editorial content is written without prejudice or bias, regardless of sponsor or affiliate associations."

### C.    Teresa Dowdell

Teresa Dowdell is a former business partner of Brendan and Danny O'Shea.  According to Dowdell, the editorial independence proclaimed by the Review Hosts is a lie.  Dowdell worked with Brendan and Danny O'Shea from 2002 to 2014; first for an entity named Nutrazone LLC and later for an entity named Syntegy LLC.  Dowdell avers that Danny and Brendan O'Shea first began working with the Review Hosts to market and sell nutritional supplements for Nutrazone in 2002.  According to Dowdell, Khanbahadur and another man, Khalid Rizwan, operated the Review Hosts, but Brendan and Danny O'Shea actually controlled them.

Dowdell avers that Brendan and Danny O'Shea partnered with Khanbahadur and Rizwan of the Review Hosts in a scheme as follows: the Review Hosts hosted websites that purported to give unbiased "reviews" of competitor's products using a sham and manipulated ranking system. The Review Hosts paid third-party copywriters to prepare the reviews with an appearance of

objectivity, but always concluding that the competitors' products were inferior.  Potential customers who entered the name of competitors' products into search engines would see results near the top of the list using phrases like "shocking facts," "exposed," "scam," or "warning," and urging customers to first review the Review Hosts' purportedly-unbiased reviews before purchasing the competitor's product.  Prospective customers who clicked on these links would see the Review Hosts' sham review, including false and disparaging information about the competitor's product.  The review pages would invariably rank Brendan and Danny O'Shea's products as "#1" or "top choice."  Though the Review Websites purported to be independent and unbiased, Brendan and Danny O'Shea actually controlled what content was posted or taken down, and the Review Hosts did not independently control the content of the Review Websites without oversight from the O'Sheas.

Dowdell avers that Danny and Brendan O'Shea, through their partnership with the Review Hosts, would also use the names of competitors' products as paid search engine terms, so that customers searching for competitors' products would instead be directed to the Review Websites.  According to Dowdell, Brendan and Danny O'Shea's nutritional supplement businesses derived the majority of their revenue from these marketing tactics.

**D.    Present suit**

Each of the Plaintiffs market and sell nutritional supplements that are the subject of "reviews" hosted on the Review Websites.  Each Plaintiff claims quantifiable losses as a result of Defendants' marketing tactics.  Plaintiffs bring claims for trademark infringement and false advertising under the Lanham Act, 15 U.S.C. §§1114, 1125(a), as well as Missouri common law claims for unfair competition, commercial disparagement, defamation, and tortious interference.

## II.     Motion to exclude expert testimony

### A.     Standard

Federal Rule of Evidence 702, which governs the admission of expert testimony in federal court, provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, district courts act as gatekeepers, ensuring that expert testimony is "not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597).  The reliability requirement means "the party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid," while the relevance requirement demands "the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue."  *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)).

The Eighth Circuit Court of Appeals has stated that proposed expert testimony must meet three criteria to be admissible under Rule 702.  "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of

fact." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (internal quotation marks omitted). To meet the third requirement, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id.*; Fed. R. Evid. 702(b)-(d).

The Eighth Circuit has admonished district courts "not to weigh or assess the correctness of competing expert opinions." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross–examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590, 596). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758.

### B.    Analysis

The Court first considers Defendants' motion to exclude Plaintiffs' proffered damages expert, Sanford H. Krachmalnick. Doc. 146. Plaintiffs retained Krachmalnick as a damages expert for the purpose of determining the amount of d=Defendants' earnings derived from Defendants' allegedly infringing activities. The parties have fully briefed the motion to exclude. The Court has taken into consideration the parties' arguments, the deposition transcripts

submitted, and Krachmalnick's report in making this determination.  For the reasons set forth below, the Court denies the motion.

Defendants argue for the exclusion of Krachmalnick's testimony on multiple grounds. First, Defendants argue that Krachmalnick's testimony should be excluded as unreliable because it is factually unsupported.  Second, Defendants argue that Krachmalnick's methodology was unreliable and misapplied.  Finally, Defendants argue that Krachmalnick's testimony should be excluded as "the mere extension of counsel's unproven assumptions."  Doc. 147 at 13.

Defendants do not challenge Krachmalnick's credentials or qualifications, and the Court finds that he is qualified.  Krachmalnick is a certified public account with over thirty years of experience in his field.  Doc. 149-2 at 69.  He is a member of the American Institute of Certified Public Accountants, the Missouri Society of Certified Public Accountants, and the National Association of Accountants.  *Id.*  He has experience in audit and forensic accounting, including in the litigation context.  *Id.*  Plaintiffs retained Krachmalnick as a damages expert for the purpose of determining the amount of Defendants' earnings derived from Defendants' allegedly infringing activities.  Krachmalnick's qualifications meet the requirements of Rule 702.

Krachmalnick's report includes two categories of conclusions, based on two distinct sources of data.  First, Krachmalnick quantifies the annual profits of Defendant Admark, LLC based on financial records provided by Defendants.  Second, Krachmalnick purports to quantify online sales of Defendants' products traceable to Plaintiffs' trademarks, based on information provided by a third-party vendor, Order Dynamics Corporation.  Defendants apparently do not challenge the first category of Krachmalnick's conclusions.  Instead, all of Defendants' criticisms relate to the second category of Krachmalnick's conclusions: the quantification of Defendants' sales allegedly traceable to Plaintiffs' trademarks.  Defendants first argue that

Krachmalnick's testimony on this subject should be excluded as unreliable because it is "fundamentally unsupported by facts." Doc. 147 at 5. The Court disagrees.

"Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *First Union Nat. Bank*, 423 F.3d at 862. As noted above, Krachmalnick relied on information provided by Order Dynamics in completing his report. The parties do not dispute that Order Dynamics is the e-commerce vendor that processes online sales orders for Admark. Steven Berkovitz, Order Dynamics's Chief Technology Officer, provided deposition testimony and data regarding online sales of Defendants' products. Included in the data provided by Berkovitz were orders of Defendants' products based on customer searches for *Plaintiffs'* product names. Doc. 148-5 at 27-29, 36-37. Defendants do not dispute that Berkovitz provided this information or argue that Berkovitz's data is unreliable.

In reaching his conclusions regarding the amount of Defendants' earnings derived from allegedly infringing activities, Krachmalnick relied on two spreadsheets of data provided by Berkovitz. Krachmalnick included this data with his report as Exhibits 6 and 7. Notwithstanding Krachmalnick's reliance on the Order Dynamics data, Defendants argue that Krachmalnick's conclusions are fundamentally unsupported because he did not rely on the *entirety* of the dataset provided by Order Dynamics. Defendants have submitted portions of the "complete dataset" received from Order Dynamics and represented that it comprises more than 51,000 pages. Doc. 148. During his deposition, Berkovitz authenticated two spreadsheets of Order Dynamics data specifically pertaining to orders of Admark's products. Doc. 148-5 at 15-20. Plaintiffs represent, and Defendants apparently do not dispute, that Exhibit 6 to Krachmalnick's report is derived directly from the spreadsheets authenticated by Berkovitz at his

deposition.  Doc. 185 at 3.  To the extent Defendants argue that anything in the "complete dataset" contradicts Krachmalnick's conclusions, the Court finds this goes to the weight rather than the admissibility of his testimony.  Defendants will have opportunity to cross-examine Krachmalnick on this basis.

Defendants raise a separate objection to Krachmalnick's reliance on Exhibit 7.  Plaintiffs acknowledge that Krachmalnick derived Exhibit 7 from data Berkovitz provided to Plaintiff's counsel *after* Berkovitz's deposition, and that this data was not disclosed to Defendants until Plaintiffs produced it, as Exhibit 7, along with Krachmalnick's report.  Doc. 183 at 7-8. Defendants thus move to strike Exhibit 7 from the report along with any conclusions Krachmalnick derived from it, arguing that Plaintiffs' nondisclosure of communications with Berkowitz after his deposition (including the data incorporated into Exhibit 7) prejudiced Defendants.  Doc. 167 at 6.  Defendants cite no authority holding that a party must separately disclose an expert's reliance materials before disclosure of, rather than contemporaneously with, the expert's report.  Defendants concede that Plaintiffs disclosed all materials Krachmalnick relied upon when they produced his report, and Defendants do not articulate anything other than a conclusory assertion of prejudice.   The Court finds that Exhibit 7 is substantively identical to the data provided to Plaintiffs' counsel by Berkovitz after his deposition.  *Compare* Doc. 183-1 *with* Doc. 183-3.  Defendants' alleged failure to produce communications between Berkovitz and Plaintiffs' counsel might justify a motion to compel (though Defendants did not file one). However, because Plaintiffs produced Exhibit 7 with Krachmalnick's report, and Defendants could have earlier subpoenaed information from non-party Berkovitz themselves, Defendants fail to demonstrate a basis to strike Exhibit 7.

Defendants next argue that Krachmalnick's testimony should be excluded because his methodology was unreliable.  Specifically, Defendants assert that Krachmalnick improperly quantified some entries in the data as "sales" when they were actually uncompleted orders.  At his deposition, Krachmalnick admitted that he included in his quantification of sales certain data entries actually representing canceled or failed orders.  Doc. 149-1 at 85:16-86:1. Plaintiffs assert that the number of improperly included entries is *de minimis*, and thus argue this objection goes to the weight rather than the admissibility of Krachmalnick's testimony.  The Court agrees. Upon review of Exhibits 6 and 7 to Krachmalnick's report, the Court finds that the vast majority of entries represent completed and shipped orders.  *See* Docs. 183-2, 183-3.  Further, Defendants will have opportunity at trial to cross-examine Krachmalnick about this apparently-admitted flaw in his calculation.  The jury can decide what weight (if any) to give his resultant conclusions.

Finally, Defendants argue that Krachmalnick's testimony must be excluded as "the mere extension of counsel's unproven assumptions."  Doc. 147 at 13.  Defendants make essentially the same argument multiple times and in different ways, but their objection boils down to this: Krachmalnick did not independently verify that any of the data included in Exhibits 6 and 7 actually related to Plaintiffs' trademarks or to any infringing activity by Defendants.  Plaintiffs respond that they retained Krachmalnick solely to provide a *quantification* of damages, not to opine on liability or causation.  Doc. 155 at 13-14.

Federal Rule of Evidence 703 permits an expert to base his opinion on any data "that the expert has been made aware of" provided the data is of a type "experts in the particular field would reasonably rely on."  Fed. R. Evid. 703.  Defendants implicitly concede that the data Krachmalnick relied on here, i.e., lists of sales orders and prices, is of a type reasonably relied upon by accounting experts.  Instead, Defendants argue that Krachmalnick's conclusions lack

10

"factual foundation" because their relevance in this case depends on unproven assumptions. Doc. 147 at 13-14.

The Court finds that Defendants' criticism goes to the foundation of Krachmalnick's testimony, rather than the admissibility factors under Federal Rule of Evidence 702.  *See Steak N Shake Inc. v. White*, No. 4:18-CV-00072-SRC, 2020 WL 85172, at *7 (E.D. Mo. Jan. 7, 2020); *see also Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir. 2000).  Unless Plaintiffs lay the proper foundation showing that the data entries in Exhibits 6 and 7 are actually traceable to Plaintiffs' marks and Defendants' allegedly infringing activity, the Court may ultimately determine that Krachmalnick's quantification of sales is not relevant to any fact at issue.  But the rules of evidence do not require an expert witness to provide the foundation for his own testimony.  *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.  The court may admit the proposed evidence on the condition that the proof be introduced later.").  Thus, final resolution of this issue will depend on evidence adduced at trial.  For now, the Court finds that Krachmalnick's testimony is based on sufficient facts and reliable methodology, and thus denies Defendants' motion to exclude his testimony.  Fed. R. Evid. 702(b)-(d).

## III.     Motion to strike exhibits

### A.     Standard

"The power of the trial court to exclude exhibits and witnesses not disclosed in compliance with its discovery and pretrial orders is essential to the judge's control over the case."  *Sellers v. Mineta*, 350 F.3d 706, 711 (8th Cir. 2003).  "If a party fails to disclose information or identify a witness as required by Rule 26(a) or (e), the party shall not be permitted to use [the nondisclosed information as] evidence on a motion, at a hearing, or at trial unless the

failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Failure to disclose in

a timely manner is equivalent to failure to disclose.  *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004,

1008 (8th Cir. 1998).  "The rules thus permit a court to exclude untimely evidence unless the

failure to disclose was either harmless or substantially justified."  *Id.*

### B.    Analysis

Defendants move to strike a number of exhibits Plaintiffs offer in opposition to

Defendants' summary judgment motion, alleging that the exhibits were not previously produced.

Doc. 170.  The parties' briefing on this motion is not a model of clarity.  Defendants' initially

moved to strike 53 exhibits, but in their reply brief withdraw their motion to strike all but 26

exhibits, admitting that the others were, in fact, produced.  Doc. 178.  In an affidavit supporting

Plaintiffs' opposition brief, Plaintiffs' counsel offers Bates numbers at which many of the

disputed exhibits were allegedly produced, but in sur-reply Plaintiffs acknowledge that many of

those Bates numbers were wrong.  Doc. 184.  Further, Plaintiffs' counsel simultaneously

represents that certain exhibits were made available to Defendants during depositions while also

stating that the same exhibits were *not* available during the depositions because they were not

created until after the close of discovery.  Doc. 175-1 at ¶¶ 6-7.  Against this muddled backdrop,

the Court will sort through the motion.

Defendants maintain their motion to strike 26 of Plaintiffs' exhibits.  Doc. 178 at 4.  The

disputed exhibits fall into two categories.  The first category consists of exhibits that Plaintiffs

admit they did not produce during discovery because they were not created until after the close

of discovery.  The second category consists of exhibits that Defendants allege Plaintiffs did not

produce during discovery but Plaintiffs claim they did produce.

As to the first category, Plaintiffs argue that these exhibits—which wholly consist of screenshots of websites and internet search results—were created after the close of discovery for the limited purpose of showing that Defendants' allegedly infringing behavior is continuing. Thus, Plaintiffs argue that their failure to disclose was "substantially justified." Fed. R. Civ. P. 37(c)(1). Further, Plaintiffs argue that these internet screenshots were equally available to Defendants so any failure to disclose was harmless. *Id.* In *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Comm'rs*, No. 4:10-CV-2163 CEJ, 2012 WL 3564030, at *9 (E.D. Mo. Aug. 17, 2012), this Court found that the plaintiff's failure to previously disclose exhibits offered in opposition to summary judgment was substantially justified and harmless under Rule 37(c)(1). *Id.* at *9 n.8. The exhibits consisted of 120 pages of newspaper articles. *Id.* Because the exhibits were gathered by plaintiff for the purpose of responding to arguments in defendants' summary judgment motions, and because the newspaper articles were equally available to defendants, the Court held that the nondisclosure was both substantially justified and harmless. *Id.* The Court finds the same principles applicable here, and thus denies Defendants' motion to strike Exhibits 159-1, 159-2, 159-4, 159-74 to 159-77, 159-79 to 159-82, and 159-89 to 159-83.

The remaining category of exhibits Defendants move to strike are documents that Defendants claim were not produced in discovery and Plaintiffs assert were, in fact, produced. Based on the unrefuted affidavits of Plaintiffs' counsel (Docs. 175-1, 184-1), the Court finds that the following exhibits were produced: 159-6, 159-24, 159-19[1], 159-27, 159-33, and 159-46. Thus, the Court denies Defendants' motion to strike these exhibits.

Plaintiffs fail to show that Exhibits 159-29, 159-85 to 159-88, or 159-97 were included in their production to Defendants. Plaintiffs represent that they previously produced Exhibit 159-

---

[1] Produced at Nutreance 168. Doc. 175-9.

29 as Nutreance 790.  But Nutreance 790 is actually a different (albeit somewhat similar) document.  And, Plaintiffs represent that they previously produced 159-85 to 159-88 and 159-97 in a production containing Koech 151-250.  But the production submitted to the Court labeled "Koech 151-250" actually contains only Koech 151-200.  These disputed exhibits accordingly are not part of the production submitted to the Court.

The Court thus considers Plaintiffs alternative argument that all of the exhibits numbered 159-1 to 159-90 were made available to Defendants' counsel "before, during, and after the discovery depositions of Defendants Danny O'Shea and Brendan O'Shea (well before the discovery deadline)."  Doc. 175-1 at 4.  Defendants do not dispute that these documents were made available for the depositions.  Instead, Defendants argue that offering materials in conjunction with a deposition is not an adequate supplementation under Rule 26(e) because Plaintiffs did not indicate that any of the materials offered "were relevant to a particular Defendant request for production."  Doc. 178 at 5.

The only request for production Defendants claim any of the disputed exhibits was responsive to is a generic request for "all documents" Plaintiffs rely onto support their claims. *Id.* at 5.  Rule 34(b)(2)(E) requires litigants to produce electronically stored information "in a reasonably usable form."  Defendants do not claim Plaintiffs offered the documents in an unusable form.  On these facts, the method of production complies with Rule 34(b)(2)(E) and the Court denies the motion to strike Exhibits 159-29, 159-85 to 159-88.

Plaintiffs fail to show that they produced Exhibit 159-97 at any time.  Plaintiffs offer no argument that this nondisclosure was substantially justified or harmless.  Accordingly, the Court grants Defendants' motion to strike Exhibit 159-97 only.  Fed. R. Civ. P. 37(c)(1).

## IV.    Motion for summary judgment

### A.    Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The proponent need not, however, negate the opponent's claims or defenses.  *Id.* at 324–25.

In response to the proponent's showing, the opponent must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" dispute of material fact is more than "some metaphysical doubt as to the material facts."  *Id.* at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable...or is not significantly probative...summary judgment may be granted."  *Id.* at 249–50 (citations omitted).

B.     **Analysis**

Defendants move for summary judgment on all counts of Plaintiffs' Complaint. Defendants first argue for summary judgment on the grounds that no named defendant was actually involved in the allegedly infringing activity described in the Complaint.  Defendants argue that Plaintiffs have "sued the wrong parties"—because independent third-parties, the Review Hosts, created and maintained the Review Websites without input or control from any defendant.  Doc. 141 at 1.

Plaintiffs offer no evidence that Defendants Primark, LLC, Wastena Holdings, LLC, or iHealth Fulfillment Services Limited Liability Company were involved in any activity alleged in the Complaint (*see* Doc. 142 at ¶ 65; Doc. 154 at 23), and offer no argument in opposition to Defendants' motion for summary judgment as to these entities.  Accordingly, the Court grants summary judgment as to Defendants Primark, LLC, Wastena Holdings, LLC, and iHealth Fulfillment Services Limited Liability Company.

Conversely, Plaintiffs have offered substantial evidence that Defendants Admark, LLC, Brendan O'Shea, and Danny O'Shea participated in the allegedly infringing activities.  Plaintiffs offer the affidavit of Teresa Dowdell, a former business partner of Brendan and Danny O'Shea. Doc. 154-1.  Dowdell avers that Brendan and Danny O'Shea exercised considerable if not complete control over the content on the Review Websites.  Dowdell describes a scheme orchestrated by the O'Sheas, in partnership with Rizwan and Khanbahadur of the Review Hosts, to publish sham and disparaging reviews of competitors' products, while giving "top choice" ranking to the products sold by the O'Sheas and Admark, all under the guise of editorial independence.

Defendants argue that because Dowdell never worked for Admark, LLC and because her partnership with Danny and Brendan O'Shea ended in 2014, she cannot have personal knowledge of the specific infringement alleged in this case, which allegedly began in 2017. Dowdell partnered with the O'Sheas for approximately 12 years as a member of two entities, Nutrazone LLC and Syntegy LLC. Dowdell avers that the O'Sheas began working with Rizwan and Khanbahadur to market products sold by Nutrazone and later continued that joint venture to market Syntegy products. Further, Dowdell avers personal knowledge that the O'Sheas continued this joint venture to market Admark products. The scheme she describes, as set forth above, mirrors closely the specific allegations of infringing activity in Plaintiffs' Complaint. Viewing Dowdell's testimony in the light most favorable to Plaintiffs, a jury could reasonably infer that the O'Sheas and Admark continued to exercise control over the Review Websites' content after Dowdell's partnership with the O'Sheas ended.

Defendants also move for summary judgment on behalf of individual defendant Eileen Olympia O'Shea, the wife of Danny O'Shea. Plaintiffs acknowledge that their only evidence connecting Olympia O'Shea to any activity alleged in the Complaint is one sentence in Dowdell's affidavit. Doc. 179 at 1-2. Dowdell states that Olympia O'Shea "was an owner/member of either Admark, LLC or Primark, LLC or another corporate entity," "made contributions to the various businesses owned by her husband," and "was aware of" Danny and Brendan's scheme with Rizwan, Khanbahadur, and the Review Hosts. Doc. 154-1 at ¶ 27.

The Court finds this evidence insufficient to support liability. First, Dowdell is equivocal about Olympia's relationship to Admark. The Court has already dismissed Primark and the other remaining entity defendants, so any relationship with those entities is irrelevant. Second, even if Olympia was a member of Admark, Plaintiffs offer no evidence or argument showing why she

should be individually liable for the actions of the entity.  Finally, Plaintiffs fail to establish why

mere "awareness" of infringing activity by others is sufficient to establish personal liability.

Thus, the Court grants Defendants' motion for summary judgment as to Olympia O'Shea.  The

Court now turns to Defendants' arguments for summary judgment as to the specific claims in

Plaintiffs' Complaint.

### 1.       Count I – trademark infringement

Count I alleges trademark infringement in violation of Section 32 of the Lanham Act, 15

U.S.C. §1114.  Section 32 protects the holder of a federally registered trademark from the

unauthorized

> use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation
> of a registered mark in connection with the sale, offering for sale, distribution, or
> advertising of any goods or services on or in connection with which such use is
> likely to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C. §1114(1)(a).

At the time Plaintiffs filed their Complaint, only Plaintiff Koech Corp. was the registrant

of a federally-registered trademark, for MACAFEM.  After filing, Plaintiff Nutreance registered

the trademarks REDIMOVE, REDICALM, REDIMIND, and REDINITE.  Docs. 159-79 to 159-

82.  Section 32 grants standing to assert a claim for trademark infringement only to

the registrant of a trademark.  15 U.S.C. § 1141(1); *Kia Motors Am., Inc. v. Autoworks Distrib.*,

No. CIV. 06-156 DWF/JJG, 2007 WL 4372954, at *2 (D. Minn. Dec. 7, 2007); *Zetor N. Am.,*

*Inc. v. Rozeboom*, No. 3:15-CV-03035, 2018 WL 3865411, at *5 (W.D. Ark. Aug. 14, 2018).

Accordingly, Nutreance may only bring a claim under 15 U.S.C. § 1141(1) to the extent it claims

Defendants infringed its marks at a time after their registration.  *John Beal, Inc. v. Roofpros, Inc.*,

No. 4:16 CV 1151 CDP, 2016 WL 7439214, at *2 (E.D. Mo. Dec. 27, 2016).

"[T]he 'core element' of trademark infringement law is 'whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product.'" *Davis v. Walt Disney Co.*, 430 F.3d 901, 905 (8th Cir. 2005) (quoting *Brother Records, Inc. v. Jardine,* 318 F.3d 900, 908 (9th Cir. 2003)).  Defendants argue Plaintiffs have offered no evidence showing the likelihood of confusion as to the source of Defendants' or Plaintiffs' products.  In response, Plaintiffs do not contend that they have shown *source* confusion, but argue only that they have shown a likelihood of confusion as to "affiliation, connection, or association" sufficient to support a claim under 15 U.S.C. §1125(a)(1)(A).  But Count I does not assert a claim under that section (Count III, addressed below, does).  Thus, Plaintiffs have abandoned their claim for infringement under 15 U.S.C. §1114(1), and cannot amend their Complaint via a brief.  *Morgan Distrib. Co., Inc. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir. 1989) ("axiomatic" that complaint may not be amended by brief); *see also WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017).  Accordingly, the Court grants Defendants' motion for summary judgment on Count I.

### 2.      Count II – false advertising

Section 43(a) of the Lanham Act provides:

(1)      Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  "Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).  Unlike a trademark infringement claim under 15 U.S.C. §1114(1), the protections of 15 U.S.C. §1125(a) are not limited to registered trademarks.  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144–45 (2015).

In Count II, Plaintiffs assert a claim for false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B).  To succeed on this claim, Plaintiffs must show:  (1) Defendants made false statements of fact about their own or another's products; (2) the statements actually deceived or had the tendency to deceive a substantial portion of the audience; (3) the deception was material; (4) Defendants caused the false statements to enter interstate commerce; and (5) Plaintiffs have been or are likely to be injured because of Defendants' false statements.  *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 929 (E.D. Mo. 2010) (citing *Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005)).  A statement is considered false under this section even if it is "literally true or ambiguous," but nonetheless "renders a 'false impression' when viewed in context."  *Allsup, Inc.*, 428 F.3d at 1138.  Further, while literal falsity may be determined as a matter of law, whether a statement is misleading is an issue of fact.  *Id*

The Court finds Plaintiffs have offered sufficient evidence of each element of false advertising to withstand Defendants' motion for summary judgment.  Plaintiffs offer evidence, including Dowdell's affidavit, showing that Defendants exercised considerable or complete control over the content on the Review Websites.  Plaintiffs also offer evidence that the Review

Websites published false representations of independence and lack of bias.  Further, Plaintiffs

offer evidence that the Review Websites' reviews of their products included literally false

statements, including the false representation that no clinical studies were done on any of

Plaintiffs' products.   Docs. 154-2, 154-3, 154-4. Those statements entered interstate commerce

via their publication on the internet.  *United States v. Giboney*, 863 F.3d 1022, 1026 (8th Cir.

2017).

   Defendants argue that Plaintiffs have failed to show that a substantial portion of the

audience was actually deceived or a likelihood of such deception.  However, with a literally false

claim, "a court may grant relief without considering whether the buying public was actually

misled; actual consumer confusion need not be proved."  *United Indus. Corp. v. Clorox Co.*, 140

F.3d 1175, 1180 (8th Cir. 1998).  Here, Plaintiffs offer evidence that the Review Hosts published

literally false claims about their products, including the false representation that no clinical

studies were done on the products.  Plaintiffs accordingly satisfy the element of audience

deception for purposes of summary judgment.

   As to materiality, in addition to false statements in the reviews of Plaintiffs' products,

Plaintiffs offer evidence that Defendants, through the Review Hosts, published sham reviews,

purporting to be unbiased, that consistently ranked Plaintiffs' products as inferior to Defendants'

competing products.  Doc. 154-1.  A jury could reasonably conclude these were material

falsehoods.  Regarding injury, Plaintiffs offer evidence, in the form of affidavits from principal

members of the Plaintiff entities, that each Plaintiff suffered quantifiable losses as a result of

Defendants' disparagement of their products.  Docs. 154-2, 154-3, 154-4.  Plaintiffs also offer

Krachmalnick's expert testimony to quantify Defendants' unjust enrichment.  Plaintiffs have

presented enough evidence to create a genuine issue of fact as to each element of false

advertising.  The court denies Defendants' motion for summary judgment on Count II.

### 3.      Count III – federal unfair competition

In Count III, Plaintiffs assert a claim for "federal unfair competition," citing 15 U.S.C.

§1125(a).  While not entirely clear from the Complaint, Plaintiffs presumably intended to assert

in Count III a distinct false association claim under §1125(a)(1)(A) rather than an omnibus

§1125(a) claim that would in part duplicate the §1125(a)(1)(B) claim of Count II.  The Court

analyzes Count III accordingly.

Section  §1125(a)(1)(A) provides for civil liability for "[a]ny person who ... uses in

commerce any word, term, name, symbol, or device, or any combination thereof, or any false

designation of origin, false or misleading description of fact, or false or misleading

representation of fact, which is likely to cause confusion . . . as to the affiliation, connection, or

association of such person with another person, or as to the origin, sponsorship, or approval of

his or her goods, services, or commercial activities by another person." 15 U.S.C.

§1125(a)(1)(A).  The Supreme Court has characterized this section as the statutory tort of "false

association," *id.*, and described it as prohibiting trademark infringement of unregistered marks.

*B & B Hardware, Inc.*, 575 U.S. at 144–45 (2015).

Section 1125(a)(1)(A) expressly prohibits misleading representations "as to the

affiliation, connection, or association" of the defendant with another person.  15 U.S.C.

§1125(a)(1)(A).  "The question of trademark infringement, and of unfair competition, is whether

there is a likelihood of confusion."  *Phoenix Entm't Partners, LLC v. Ryco Enterprises, LLC*, 306

F. Supp. 3d 1121, 1127 (E.D. Mo. 2018).  Likelihood of confusion is a finding of fact.  *SquirtCo.*

*v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  But this does not mean that likelihood of

confusion may never be determined on summary judgment.  *Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016).

The Eighth Circuit set forth non-exclusive factors to be considered in weighing likelihood of confusion: (1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers.  *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 774 (8th Cir. 1994) (citing *SquirtCo*, 628 F.2d at 1091)).  "No one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases."  *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1053 (8th Cir. 2005).

The Court finds Plaintiffs have offered evidence from which a jury could reasonably find likelihood of confusion regarding, at least, "the affiliation, connection, or association" of Defendants with the Review Hosts and Plaintiffs' trademarks.  15 U.S.C. §1125(a)(1)(A).  In making this determination, the Court gives significant weight to Plaintiffs' evidence that Defendants Admark and Brendan and Danny O'Shea deliberately concealed—and in fact materially misrepresented—their affiliation with the Review Hosts and the Review Websites.  Further, Plaintiffs offer evidence that Defendants used Plaintiffs' marks as paid search terms on internet search engines to steer customers to the sham review pages hosted by the Review Hosts and, in turn, to Defendants' competing products.  Docs. 154-1, 154-2, 154-3, 154-4.  Defendants' products directly compete with Plaintiffs' products in the nutritional supplement marketplace.  From these facts, a jury could reasonably find likelihood of confusion.  The Court thus denies Defendants' motion for summary judgment on Count III.

### 4.      Count IV – common law unfair competition

"'Missouri law is well settled that the same facts which support a suit for trademark
infringement [under § 43(a) of the Lanham Act] support a suit for unfair competition and
common law infringement.'  Conversely, the same allegations that fail to support a claim of
unfair competition under § 43(a) of the Lanham Act fail to support a claim of common law
unfair competition."  *Phoenix Entm't Partners, LLC v. Sports Legends, LLC*, 306 F. Supp. 3d
1112, 1119–20 (E.D. Mo. 2018) (quoting *Cmty. of Christ Copyright Corp. v. Devon Park
Restoration Branch of Jesus Christ's Churc*h, 634 F.3d 1005, 1010 (8th Cir. 2011)).  The Court
has already determined that Plaintiffs present a submissible case for "false association" or
trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).
Accordingly, Plaintiffs claim for common law unfair competition also withstands summary
judgment.

### 5.      Count V – commercial disparagement

In Count V, Plaintiffs assert a Missouri common law claim for commercial
disparagement.  Missouri law provides that

> One who publishes a false statement harmful to the interests of another is subject
> to liability for pecuniary loss resulting to the other if (a) he intends for publication
> of the statement to result in harm to interest of the other having a pecuniary value,
> or either recognizes or should recognize that it is likely to do so, and (b) he knows
> that the statement is false or acts in reckless disregard of its truth or falsity.

*Cuba's United Ready Mix, Inc. v. Bock Concrete Foundations*, Inc., 785 S.W.2d 649, 651 (Mo.
Ct. App. 1990); *see also Renaissance Learning, Inc. v. Metiri Grp., LLC*, No. 07-0413-CV-W-
SWH, 2009 WL 3426677, at *2 (W.D. Mo. Oct. 23, 2009).

Defendants argue that Plaintiffs have not established any false statement, have not shown
intent to harm Defendants, and have offered no evidence of pecuniary loss.  The Court has

already addressed Plaintiffs' evidence of falsehood with respect to Counts II and III above. With

respect to harmful intent, Dowdell's affidavit states that

> Danny and Brendan O'Shea were fully aware that their profits from the 21 Century
> review websites were directing profits away from the competitor products, knew
> that they were lowering the market share of competing products by disparaging
> them and falsely claiming the competitor product was inferior, and their intent was
> to profit by disparaging and undermining the marketing efforts and visibility of
> competing products.

Doc. 154-1 at ¶ 37.  A jury crediting Dowdell's testimony could reasonably infer that Defendants

acted with intent to harm Plaintiffs' interests.  Finally, as noted above, Plaintiffs offer evidence,

in the form of affidavits from principal members of the Plaintiff entities, that each Plaintiff

suffered quantifiable losses as a result of Defendants' disparagement of their products.[2]  Docs.

154-2, 154-3, 154-4.  Accordingly, the Court denies Defendants' motion for summary judgment

as to Count V.

### 6.     Count VI - defamation

In Count VI, Plaintiffs assert a claim for defamation.  To prevail on a defamation claim, a

plaintiff must prove (1) publication, (2) of a defamatory statement, (3) that identifies the

plaintiff, (4) that is false, 5) that is published with the requisite degree of fault, and 6) damages

the plaintiff's reputation.  *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 798 (Mo.

2017).  "The issue of falsity relates to the defamatory facts implied by a statement—in other

words, whether the underlying statement about the plaintiff is demonstrably false."  *Overcast v.

Billings Mut. Ins. Co.*, 11 S.W.3d 62, 73 (Mo. 2000).  Defendants move for summary judgment,

arguing that Plaintiffs have not established any element of defamation.

---

[2] Because Plaintiffs' have voluntarily dismissed their claim for lost profits [Doc. 68], they must prove at trial that
they suffered "pecuniary loss" distinct from lost profits.

The Court finds Plaintiffs have presented evidence sufficient to create a genuine issue of fact on each defamation element.  Plaintiffs offer evidence that Defendants exercised considerable or total control over the Review Hosts, including control over the reviews on the Review Websites.  Plaintiffs offer evidence that the reviews of Plaintiffs' products included literally false statements, including the false representation that no clinical studies were done on the products.  A statement is defamatory if it "casts aspersions on [a] person's reputation so as to lower him in the estimation of the community or to deter third person's from associating with him." *Pape v. Reither*, 918 S.W.2d 376, 380 (Mo. Ct. App. 1996).  A reasonable jury could conclude Defendants' false statements defamed Plaintiffs.  As to fault, Dowdell avers that Defendants "were fully aware that they were lowering the market share of competing products by disparaging them and falsely claiming the competitor [sic] product was inferior." Doc. 154-1 at ¶ 37.  Finally, each Plaintiff offers evidence that the Review Websites' sham reviews negatively impacted customers' perceptions of Plaintiffs' products and thus their reputations. Docs. 154-1, 154-2, 154-3, 154-4.  Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find each elements of defamation.  The Court denies Defendants' motion for summary judgment on Count VI.

### 7.    Count VII – tortious interference

Plaintiffs' final claim is for tortious interference.  Missouri common law recognizes tortious interference claims based on either a contract or a valid business expectancy.  *See Cook v. MFA Livestock Ass'n*, 700 S.W.2d 526, 529 (Mo. Ct. App. 1985).  To prevail on a claim of tortious interference, Plaintiffs must prove: (1) a contract or valid business expectancy; (2) Defendants' knowledge of the contract or relationship; (3) Defendants' intentional interference causing a breach of the contract or relationship; (4) absence of justification for Defendants'

interference; and (5) Plaintiffs' damages resulting from Defendants' conduct. *Process Controls Int'l, Inc.*, 753 F. Supp. 2d at 931 (citing *Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. 1990).

The parties' briefing does not address whether a different evidentiary standard applies to tortious interference claims based on business expectancy rather than contract. Based on its own research, the Court finds Missouri courts have not articulated different standards. Whether based on contract or business expectancy, "[l]iability under a tortious interference theory cannot be predicated upon speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Wash Solutions., Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 896 (8th Cir. 2005) (business expectancy); *A.L. Huber & Son, Inc. v. Jim Robertson Plumbing, Inc.*, 760 S.W.2d 496, 499 (Mo. Ct. App. 1988) (contract).

Defendants argue that Plaintiffs have failed to show any valid business expectancy or that Defendants knew of any such business expectancy. "For plaintiff to have a reasonable business expectancy, there must be a probable future business relationship from which it anticipated receiving financial benefits." *John Beal, Inc.*, 2016 WL 7439214, at *3 (citing *Eib v. Federal Reserve Bank of Kansas City*, 633 S.W.2d 432, 435–36 (Mo. Ct. App. 1982)). Because a reasonable business expectancy cannot be based on speculation or conjecture, "[t]he hope of establishing a business relationship through prospective dealings with customers with whom there has been no course of prior dealings does not constitute a reasonable business expectancy." *Id.*

The Court finds Plaintiffs have failed to create a genuine issue of fact regarding the second element of tortious interference: Defendant's knowledge of a reasonable business expectancy. Plaintiffs' evidence shows that the Review Websites' sham reviews and product

rankings confused and misled not only prospective customers, but Plaintiffs' *existing* customers as well. *See, e.g.,* Doc. 154-2 at ¶ 28. However, Plaintiffs offer no evidence that Defendants knew Plaintiffs had an existing relationship with these customers. Plaintiffs' only evidence regarding Defendants' knowledge of "business expectancies" comes from Dowdell's affidavit. But Dowdell avers only that the Brendan and Danny O'Shea and Admark knew they were interfering with Plaintiffs' "prospective customers." Doc. 154-1 at ¶¶ 42-43. "[A] mere assertion of interference with prospective customers fails to raise a right to relief above the speculative level." *John Beal, Inc.*, 2016 WL 7439214, at *3.

Because Plaintiffs offer no evidence showing Defendants had knowledge of their *existing* business relationships, Plaintiffs fail to establish the second element and Plaintiffs' claim fails. *Id.* at *4; *see also Boxes of St. Louis Inc. v. Davolt*, No. 4:09CV922 RWS, 2010 WL 3118319, at *2 (E.D. Mo. Aug. 5, 2010) (claim dismissed where plaintiff failed to allege that defendant had any knowledge of existence of valid business relationship); *Icard Stored Value Sols., L.L.C. v. West Suburban Bank*, No. 4:07–CV–1539 CAS, 2008 WL 619236, at *5 (E.D. Mo. Mar. 3, 2008) (claim of tortious interference with contract dismissed where plaintiff failed to allege that defendant had knowledge of contract). Accordingly, the Court grants Defendants' motion for summary judgment on Count VII.

## IV. Plaintiffs' motion to strike

Finally, the Court addresses Plaintiffs' motion to strike certain portions of the declaration of Jayson Sohi and related materials submitted in support of Defendants' motion for summary judgment. Doc. 157. First, Plaintiffs move to strike statements of Mr. Sohi that constitute mere legal opinion. To the extent Sohi's declaration contains inadmissible statements of legal opinion, the Court has given them no weight in its consideration of Defendants' motion for summary

judgment.  Accordingly, the Court denies as moot Plaintiffs' motion to strike statements from Sohi's declaration.

Second, Plaintiffs move to strike an uncertified transcript of a deposition of Olympia O'Shea, submitted as an exhibit to Sohi's declaration.  Defendants' sole purpose for offering this transcript was to show that Ms. O'Shea has no affiliation with Admark, LLC.  *See* Doc. 142 at ¶ 33.  All relevant facts in the deposition transcript are otherwise established by Ms. O'Shea's affidavit (Doc. 105-5), which Plaintiffs do not challenge.  As detailed above, the Court grants summary judgment for Ms. O'Shea because Plaintiffs have failed to offer any evidence of her personal involvement in any infringing activity.  Thus, the Court denies as moot Plaintiffs' motion to strike the uncertified transcript.

Accordingly,

**IT IS HEREBY ORDERED** that [146] Defendants' Motion to Exclude the Testimony of Sanford Krachmalnick is DENIED.

**IT IS FURTHER ORDERED** that [170] Defendants' Motion to Strike Exhibits is GRANTED in part and DENIED in part, as set forth in detail above.

**IT IS FURTHER ORDERED** that [140] Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part, as set forth in detail above.

**IT IS FINALLY ORDERED** that [157] Plaintiffs' Motion to Strike Portions of the Declaration of Jayson Sohi is DENIED, as moot.

So Ordered this 10th day of July, 2020.

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**